**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF VERMONT**

UNITED STATES OF AMERICA,        :
                                 :
            v.                   :    Case No. 2:20-cr-8-1
                                 :
                                 :
CHRISTOPHER M. MESICK,           :
a.k.a. Tovi Rose Mesick          :

**OPINION AND ORDER**

(ECF Nos. 48, 50)

Defendant Christopher M. Mesick, a.k.a. Tovi Rose Mesick, ("Mesick"),[1] is charged with being a felon in possession of firearms in violation of § 922(g)(1), and an unlawful user and addict of a controlled substance in possession of firearms in violation of § 922(g)(3). ECF No. 56. On January 5, 2020, Vermont State troopers Andrew Underwood ("Underwood") and Brian Connor ("Connor") were assigned to conduct a welfare check on Mesick at her residence. Connor saw guns inside the residence through a door window, and as a result the troopers obtained a search warrant that eventually led to the charges.

Before the Court is Mesick's motion to suppress physical evidence and statements. ECF No. 48. The Court held a hearing on

_____

[1] As further addressed below, Mesick has moved for the use of she/her pronouns and the Court grants this motion. Where statements otherwise refer to Mesick with male pronouns, this Order uses brackets to change them to female.

this motion on March 15, 2021, and at the hearing two witnesses, Underwood and Connor, testified.[2] The parties also submitted several exhibits, including cruiser camera videos from both officers' cruisers[3] and the audio of the initial dispatch call. *See* ECF No. 64. Additionally, the Court allowed the parties to submit post-hearing memoranda. ECF Nos. 67, 68.

## I.   FACTUAL BACKGROUND

**Call to Dispatch**

On January 5, 2020, at 3:01 p.m., Holly Siegel called Vermont State Police Dispatch from Colorado. Gov't Exh. 5 (Holly Siegel dispatch recording). She asked the police to do a welfare check on Mesick, who she described as "heavily intoxicated." She said that they had been "just now" speaking online. Siegel spelled Mesick's full name and gave an address. She said, "I don't know if there might be possible medical attention just based on [Mesick's] intoxication." She said Mesick had drank almost an entire bottle of tequila. Siegel was worried because Mesick was "in and out," "swaying," and alone. *Id.* at 4. Siegel also said that Mesick had had a domestic issue with a girlfriend who had hit Mesick on her face. When dispatch asked Siegel whether Mesick had said anything about self-harm, Siegel did not

---

[2] The hearing transcript is filed as ECF No. 65 ("Hrg. Tr.").
[3] Hereinafter "Connor Cruiser Video" and "Underwood Cruiser Video."

identify anything but said Mesick had "just given up hope and everything" and elaborated that:

> Yeah, [s]he's just given up. Just, [s]he's just – how much [s]he loves me and how [s]he's just not feeling it. [Sh]e just – [s]he's also transitioning to be a woman, as well, so [s]he's going through hormones, as well, on top of that. So I can't really place on, like – psychologically, I feel like [s]he's unwell and I feel like [s]he needs to be put into, like, medically, like, taken off and detox for alcohol, with the amount of alcohol [s]he does drink.

**Arrival at Mesick's Address**

Underwood was then dispatched to perform a welfare check with Connor. At the hearing, Underwood testified that he was "advised that the individual had consumed a large quantity of alcohol and made some suicidal statements to a friend, and the friend wanted us to check to make sure that they were healthy and potentially not going to overdose." Hrg. Tr. at 6. He said that he was assigned to the call at 3:09 p.m., that Sergeant Julie Sullivan ("Sullivan") asked dispatch to have rescue stationed half a mile away at 3:40 p.m., and that Underwood and Connor arrived at the residence at approximately 3:59 p.m.. *Id.* at 10-12. Underwood also testified that he had been told by other troopers that Mesick could be aggressive towards law enforcement and so should be approached with two officers.

The officers parked their cars down the street from Mesick's address. The videos from the cruisers show that Underwood and Connor approached the house, walked onto the

porch, paced the porch and knocked on the door. Signs on the property, one on the porch and two on the garage door, say "NO TRESPASSING" and "GO AWAY". Curtains hung over the windows.

Mesick approached the door to speak to the officers. Connor testified that when she spoke at that door, she opened the curtain about the width of her face. Hrg. Tr. at 73. Her first words to the officers, though muffled, appear to be "leave me alone." The officers asked Mesick whether she had talked to a "Heather or Holly," and said, "can you come out so we can talk to you real quick?" to which Mesick answered no. Mesick acknowledged that she was Facetiming with a Holly out in Colorado, but denied that she felt down. Underwood said: "You don't want to talk about it or what? Can you come – can you come out or – we don't have to come in, if you just want to come out and talk to us real quick." There was some back and forth between the officers and Mesick, in which she asked, "[y]ou're not going to fucking try and take me to goddamn jail?" and became upset with Connor, seemingly because of where he was resting his hand.

Mesick then exited the house from a different door on the porch. Underwood testified that "physically [s]he was – had trouble standing, trouble walking. And [her] speech was slurred. We observed – you could easily smell the odor of intoxicants

4

emanating from [her]." Hrg. Tr. at 19.[4] Mesick was wearing a tank top, pants, and a winter coat. Hrg. Tr. at 76. It was winter in Vermont, with snow on the ground, and some snow falling.

Mesick appeared to say to the officers, "you guys are fucking crazy." She denied making comments to Holly that she was going to "end it." When asked how much she had had to drink, Mesick said "I'm in the comfort of my own home. Am I breaking any law right now?" When asked if she had a counselor, she explained that she is a combat veteran and asked the officers, "do you understand?".

**Handcuffing**

Both officers testified that Mesick removed her own jacket and put it on the floor of the porch. Hrg. Tr. at 19-20, 65-66. Both interpreted this action as pre-attack cues. Underwood elaborated that: "removal of the jacket was a big cue that we look for. Punching fists. [Sh]e was making comments about [her] wanting us to shoot [her], if we thought we could take [her], like physically take [her], stuff like that." Though it is not clear from the video at what point exactly Mesick removed her

---

[4] Though there was extended questioning at the hearing between defense counsel and Underwood on the difference between being unsteady and unable to stand, Underwood did testify that "On several occasions you can hear us holding her arm, that she is unstable enough to where we have to support her to keep her from falling over." Hrg. Tr. at 44.

jacket, the audio leading up to the removal appears to go as

follows:[5]

> Underwood: I see you got your Mountain Warfare stickers?
>
> Mesick: Oh, what you moving up on me?
>
> Connor: Nope.
>
> Mesick: You moving up on me?
>
> Connor: No.
>
> Mesick: You want to fucking kill me?
>
> Connor: No, I don't. I definitely don't. I want to make sure you're okay, buddy.
>
> Underwood: So do you – Chris, listen to me, so do you talk to anybody from, like, a counselor or mental health or anything like that on a regular basis? I'm not moving, man.
>
> Mesick: (indiscernible).
>
> Underwood: I'm not moving; I'm just getting comfortable.
>
> Mesick: Cool. Okay, do me a favor.
>
> Underwood: What's that?
>
> Mesick: Pull that heat cannon.
>
> Underwood: The what?
>
> Mesick: Fucking shoot me.
>
> Underwood: Why? What's going on that you –
>
> Mesick: Because I'm gonna like that shit.
>
> Underwood: Why? Okay just you're – you want to sit?
>
> Mesick: Woah-oh-oh

---

[5] The video itself is the best evidence of the conversation, but for the purpose of summarizing the facts at issue here the Court puts forth this description of the dialogue, though some of the exact wording is difficult to make out. The Court also notes that at times Mesick became emotional while speaking with the officers.

Underwood: Do you want to sit down or – you're a little unsteady on your feet is all. I was—

Mesick: Well, I mean, I was in the comfort of my own home and you guys are fucking –

Underwood: We're checking on you, man. We're not – we're not here to harass you or anything.

Mesick: Well, for what? For what?

Underwood: Because of what you're saying.

Mesick: Why do you fucking check out me for?

Underwood: So now I'm concerned – easy, easy, easy.

Mesick: You don't fucking care.

Underwood: Do you want – do you want (indiscernible).

Mesick: No, what are you gonna do? Fucking send me to goddamn fucking jail --

Underwood: So do you have any friends or family around here that –

Mesick: Are you gonna fucking give me to that torture?

Underwood: Well, we're trying –

Mesick: Go ahead.

Underwood: No, we're trying –

Mesick: Go ahead.

Underwood: --to figure out--

Mesick: Go ahead.

Underwood: what's going on.

Mesick: Go ahead.

Underwood: Do you have any friends or family in the area that can come stay with you or anything?

Mesick For what?

Underwood: To make sure you're okay. Because you're obviously—

Mesick, Oh, I'm fucking okay.

Underwood: Because you're, obviously, going through some stuff.

Mesick: I am a fucking combat veteran.

Underwood: Yup. Okay.

Mesick: Oh what? Go ahead, fucking pull that heat cannon.

Underwood: Heat cannon (indiscernible)

Mesick: Go ahead. Look at that shit. Fucking tase me, bitch.

Underwood: Okay. So you don't have – Chris, look at me. So you don't have any –

Mesick: What the fuck did I do to you?

Connor: Nothing, buddy.

Mesick: You guys, fucking, knocked on my door.

Connor: Yup. We wanted to check, see how you were. We got a call from—

Mesick: Well, fucking-a, I'm a fucking still crazy from Ramadi.

Connor: Relax. Relax --

Mesick: No like oh, oh, don't shoot me.

Connor: Relax. Okay? We're just talking.

Mesick: Don't, fucking, goddamn – you know?

Connor: Relax.

Underwood: (indiscernible)

Connor: Chris, we're just talking to you, buddy.

Underwood: --to you right now, til you calm down.

Connor: Okay?

Underwood: Listen to me. Turn around. Put your hands behind your back.

Connor: Just relax. Just relax.

Mesick: No. You guys are trying to kill me.

Connor: Nope. Nope.

Underwood: For your protection, I want you to just put your hands behind your back.

Mesick: No. What am I doing?

Underwood: For your protection, okay?

Mesick: I am, literally, in my own house.

Underwood: (indiscernible)

Mesick: Stop, like, literally, trying to fucking hurt me.

Underwood: No, we're not.

Mesick: You going to take me to fucking jail?

Underwood: Nope. Because of the way you're acting right now, you're going in handcuffs, okay?

Connor Cruiser Video, at 5:46-8:18. At the hearing, Underwood testified that Mesick was becoming "more agitated" and "the best way to kind of reduce risk to [herself], harm to [herself] or harm to us, we placed [her] in handcuffs." Hrg. Tr. at 22. Underwood testified that there was a medical concern for Mesick, because she "appeared to be impaired by alcohol to the point where it was affecting [her] walking, the concern was that if you reach a certain level, you could become unconscious or instances where they've thrown up and then suffocated themselves[.]" Underwood testified that a preliminary breath test could be a factor that would help to determine where someone was on a spectrum of sobriety. Underwood testified: "In my experience, I have had individuals over a .3 who need to be medically screened just due to their – if we bring them to what we call detox and they can't walk on their own or function

9

safely, they need to be medically screened. And at a .4 is the risk for basically overdose on alcohol where your system will start to shut down and you could die." *Id.* at 24.

Once handcuffed, Mesick told the officers that she was not trying to threaten them.[6] She also said that she is allowed to drink within the comfort of her own home. She told the officers that she was uncomfortable with their hands on her and she did not want them touching her.

**Connor's Observation**

Sullivan arrived on the scene around 12 minutes into the Connor Cruiser Cam video, and began speaking with Mesick a little over ten minutes after the officers first made contact with her. At the same time, Underwood moved his cruiser into Mesick's driveway. At the hearing, Connor testified that while Sullivan was interacting with Mesick on the porch, Connor, who was also on the porch, looked through the window of the door Mesick had originally appeared at and he observed four long guns leaning against a coffee table inside. Hrg. Tr. at 67-68; 86. Around ten minutes after seeing the guns, Connor is heard mentioning them to Sullivan: "If you peer through that door I was standing next to. . . [s]he's got four long guns with

---

[6] Underwood testified that he did not remember specific threats made against the officers or specific statements from Mesick that she was going to hurt herself. Hrg. Tr. at 43-44.

bayonets sitting there right against h[er] coffee table." Connor
Cruiser Video, at 23:26 -23:40. Several minutes later, Connor
mentions the guns to Underwood: "Did you peek in that window, in
that door? Like four guns with bayonets and stuff." Connor
Cruiser Video, at 30:51-31:00. Underwood did not observe any
guns during the entirety of the encounter, nor did Sullivan. The
officers testified that none of them entered the house itself.
Later, from minutes 33:20-34:20 of the Underwood Cruiser Video,
Connor returned to the porch and used his flashlight to peer in
through Mesick's windows and doors. At that later point, Connor
was alone - Mesick was brought down off of the porch to sit in a
cruiser around minute 25:30.

Mesick eventually gave a preliminary breath test. After the
test, Underwood testified that the officers agreed she could be
released, and they asked Mesick if they could take the guns for
the evening (she declined). Underwood said they decided to leave
because of:

> Multiple factors. One being that the [preliminary breath
> test] was provided. The risk to us and [her] and the staff
> at the detox center or corrections, if it got to that point
> — that would be the options we would continue at — versus
> our conversation with [her] that [s]he deescalated and
> agreed that [s]he was pretty much done for the night and
> was going to go in and kind of relax for the rest of the
> evening and go to bed. So once — once we had verified that
> [s]he had deescalated himself and was willing to just go in
> and call it a night, we released [her].

Hrg. Tr. at 27.

11

According to the Spillman case log, as interpreted by Underwood at the suppression hearing, at 4:10 p.m. Mesick was taken into protective custody, at 4:49 p.m. Sullivan radioed to dispatch that they had received a preliminary breath test result of .255,[7] and by 5:14 p.m. all three troopers had cleared the scene. Hrg. Tr. at 23-25.

**Search and Arrest**

Underwood later ran a background check and found out that "Mesick was in fact a convicted felon and Brady disqualified" from owning and possessing firearms. Underwood used Connor's sighting of the four firearms to obtain a search warrant on January 8, 2020. ECF No. 48-1. The search warrant was executed on January 13, 2020, and 16 firearms were found at the residence. To remove Mesick from the residence during the search, she was asked to come down to the fire station. At the fire station, she was read her *Miranda* warnings, arrested, and interviewed.

**II.  ARGUMENT**

    **A. Connor's Sighting of the Guns**

---

[7] As defense counsel notes, Vermont State law only allows officers to take someone into protective custody if they are "incapacitated." Hrg. Tr. at 50-51; *see* 18 VSA § 4810. Underwood testified that someone who is in custody due to incapacitation should be transported directly to a substance abuse program or hospital, and that Mesick had not been so transported. He explained that incapacitation is different for every individual (it is not based solely on blood alcohol level). *Id.* at 59.

The central issue here is whether or not Connor violated Mesick's Fourth Amendment rights when he stood on her porch and looked through her window to spy the guns. Under the Fourth Amendment, warrantless searches and seizures inside a home are "presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). The "curtilage of the house" is also protected as the area "immediately surrounding" the house. *Florida v. Jardines*, 569 U.S. 1, 6 (2013). For the purposes of this motion, the government agrees that Mesick's side porch is within the curtilage of her home. ECF No. 54 at 6.

The Supreme Court has described the plain view doctrine as follows: "objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." *Harris v. United States*, 390 U.S. 234, 236 (1968); *see also United States v. Delva*, 858 F.3d 135, 149 (2d Cir. 2017). Under the plain view doctrine, if Connor had a right to be standing on the porch when he first saw the guns, then Mesick's Fourth Amendment rights were not violated by his observation.[8]

---

[8] Though defense counsel points out that Connor later peers into Mesick's windows with a flashlight, the Court need not decide whether that would have been a violation of Mesick's Fourth Amendment rights because by the time he peered in Connor had already mentioned seeing the guns to Sullivan and Underwood. It is thus clear that they were within his sight at an earlier time.

### 1. Implied License

Initially, the government argued in part that the officers had an implied license to be on the porch, but the Court finds this argument unpersuasive. As explained in *Jardines*, an implied license to enter the curtilage of a home "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent any invitation to linger longer) leave." 569 U.S. at 8. Yet in this case, the video evidence tended to show that Mesick had posted signs at her house and garage saying, "NO TRESSPASSING" and "GO AWAY", and that she told the troopers "leave me alone," long before Connor saw the guns. Furthermore, the officers lingered for a full ten minutes after arriving before the guns were first spotted.

### 2. Emergency Assistance

"One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). "Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* "When probable cause exists to believe there is a medical emergency, '[t]he need to protect or preserve life or avoid serious injury is justification for what would be

14

otherwise illegal absent an exigency or emergency.'" *Chamberlain v. City of White Plains*, 960 F.3d 100, 105-06 (2020) (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)).

The "emergency aid exception does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises . . . . [i]t requires only an objectively reasonable basis for believing . . . that a person within [the house] is in need of immediate aid." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (alteration and internal quotations omitted) (holding that the emergency aid exception applied where officers responded to a report of a disturbance and entered a home without a warrant after seeing a truck with a smashed front in the driveway, damaged fenceposts, broken house windows, blood on the hood of the truck, clothes inside the truck and on the door to the home, and officers could see an individual with a cut on his hand screaming and throwing things inside the home, who refused to answer whether he needed medical attention). "Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Id.* at 49. Furthermore, the objective standard is applied "by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." *Tierney v. Davidson*, 133 F.3d 189, 196-97 (2d

Cir. 1998) (internal quotation marks omitted). However, during a warrantless entry, an officer's actions "must be strictly circumscribed by the exigencies which justify its initiation." *Mincey*, 437 U.S. at 393 (internal quotation marks omitted).

The Court finds that Connor's presence on Mesick's porch was justified by the emergency aid exception. As Underwood testified, the officers were at Mesick's address because dispatch had informed them of a call from someone who knew Mesick and was worried about her mental state of mind and consumption of a significant amount of alcohol. This phone call was the primary reason the officers were initially on the porch, and it justified entry onto the porch area. Mesick's subsequent behavior justified staying on the porch. Though defense counsel emphasizes Mesick's ability to stand and answer questions, the video and audio of the interaction show that Mesick was unsteady and having trouble following a consistent line of thought. Although she was able to answer questions, her speech appeared to be slurred, and her emotions and tone shifted dramatically. When Connor first saw the guns, Mesick had not calmed down and she had not taken a preliminary breath test. Given the circumstances confronting the officers – the information provided by dispatch and the information presented to the officers at the scene - the Court finds that they had an objectively reasonable basis for believing Mesick could need aid

or would suffer from serious consequences. Thus, the combination of the phone call and Mesick's behavior legally permitted the officers to remain on the porch and complete the discussion to see if she was at risk. Then, as a result of his position on the porch, Connor saw the weapons in plain view.

### B. Statements Made by Mesick

The Court finds that the issue of whether Mesick's statements should be suppressed under the Fourth or Fifth Amendment was inadequately pled. The main issue raised in the pleadings was the Fourth Amendment search. The Court has addressed this issue. Should Mesick wish to raise questions about Fourth or Fifth Amendment constitutional violations associated with the oral statements she made, the Court will permit her to file separately.

### C. Motion to Correct Caption

Finally, the Court **grants** Mesick's unopposed motion to correct the caption of her case to reflect her name change and pronouns. ECF No. 50.

### III. CONCLUSION

For the reasons set forth above, the Court **grants** Mesick's motion to correct caption (ECF No. 50) and **denies** Mesick's motion to suppress (ECF No. 48).

17

DATED at Burlington, in the District of Vermont, this 21st day of June, 2021.

/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge